C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.

THE CENTRAL BRANCH UNION PACIFIC RAILROAD COM-
PANY v. THE ATCHISON, TOPEKA & SANTA FÉ
RAILROAD COMPANY.

1. EMINENT DOMAIN, *Right of, Not Ended.* The Atchison, Topeka & Santa
Fé railroad company, having completed the line of road authorized
by its charter, and having once condemned land in the city of Atchison
for depots, side-tracks, etc., and needing more room in said city for
the transaction of its business, instituted proceedings for condemning
more land : *Held,* That such proceedings could be maintained, and that
under the statute, the right of eminent domain was not terminated by
the completion of the road, nor exhausted by a single exercise of the
power.

2. CONDEMNATION OF LANDS ; *Right of Railroad Company.* Notwith-
standing the fact that the Atchison, Topeka & Santa Fé railroad company
was organized under a special charter of the territorial legislature, it has
a right to proceed for the condemnation of lands in accordance with the
provisions of the general statutes in respect thereto.

*Error from Atchison District Court.*

THE nature of this action, and the facts, appear in the
opinion.   May 18, 1881, the district court dissolved a tem-
porary injunction which had been granted by the probate
judge of Atchison county on behalf of the *Central Branch
Union Pacific Railroad Company* and against the *Atchison,
Topeka & Santa Fé Railroad Company,* which ruling the
plaintiff company brings here for review.

*Everest & Waggener,* for plaintiff in error :

Under the admissions and the undisputed facts, the court
below erred in dissolving the injunction.

The admitted facts show that the road of the defendant
company was constructed and completed through the state in
1873, and through Atchison county in 1872 ; and that it has
ever since been a completed and constructed railroad and in
full operation as such.   Therefore we contend that under the
power of eminent domain, as delegated by the legislature to
a railway corporation, defendant company has no power to

appropriate lands by condemnation proceedings for its use or benefit. The corporation does not now *propose* to construct its road, nor has it any line of *proposed* railroad, nor can it ask for a route for a *proposed* railroad. Its railroad is a completed one, and not a *proposed* railroad, nor does it want a *proposed* railroad line or route. We do not deny but that the right exists in the state, by virtue of its sovereign power, to authorize a completed railroad to condemn lands, but the question under the statute is: Has the legislature delegated such power or right to a completed road? We think the language of the statute is very plain that it has not. (Comp. Laws of 1879, ch. 23, art. 9, §§ 81, 87.) The question is, not as to the necessities of a completed railroad, but whether under this statute power has been delegated to condemn from time to time such additional lands as a *completed* railway company may, in its discretion, request or desire to obtain by condemnation proceedings.

In 1872 the defendant company condemned the necessary grounds for track, side-track, depots, freight houses, and all other necessary appendages for the operation of its road in Atchison county. It has not by any subsequent proceedings prior to the one at bar sought to condemn additional grounds for any railroad purposes whatever. By the terms of its charter, and the conditions of its land grant, it was compelled to complete its road many years before the commencement of the condemnation proceedings in the case at bar. By the provisions of the act of congress, approved March 3, 1863, granting lands to the state of Kansas to aid in the construction of railroads, defendant company was required to complete its road within ten years from the passage of the act. (12 U. S. Statutes at Large, § 4, p. 775.) The state accepted this trust and granted the lands to defendant company, (Comp. Laws 1879, ch. 84,) which accepted this grant, and thereby became bound by its provisions as to the time of completing its road. The condition imposed upon it, to have its roads and branches completed within a certain time, required that its power of eminent domain should be exercised before the expiration of

that time; and after that it cannot take land without the consent of the owner. The condition is not in the nature of a forfeiture, to be taken advantage of by the state alone in a direct proceeding, but the non-compliance renders the proceedings of no effect.

Under the provisions of defendant's charter, (Private Laws 1859, ch. 47, § 10,) it is only in cases where the owner refuses to agree upon terms that application can be had to the court for the appointment of three commissioners to appraise the damages; and under these provisions the court can only get jurisdiction in cases where the land cannot be obtained by purchase, or where there is a failure to agree on terms. (66 Me. 41, 44; 51 Mo. 200; 47 id. 474; 61 id. 33; 23 Mich. 418; 5 N. Y. 434. See also 78 Ill. 96; 62 Barb. 85; 36 Mich. 428; 18 Minn. 174; 51 Me. 36; 12 N. Y. 190; 12 Abb. [N. S.] 317; 46 Miss. 1.)

The proceedings of defendant company to acquire lands by condemnation proceedings must be had under its charter, and not under the general laws. (15 Barb. 43, *et seq.;* 3 Sandf. 689; 3 Oreg. 178; 23 Cal. 324; 19 id. 47; 36 id. 646; 3 Johns. Cases, 108.)

The defendant company, according to law, had exhausted its power conferred by its charter. (48 Ind. 187; 4 Neb. 21, 439.)

The restraining order should have been continued until final hearing. (11 Kas. 186; 1 id. 137. See also 17 Kas. 239; 14 id. 328, 410.)

Injunction is the proper remedy to contest the right of the defendant company to take the land in controversy. (24 Kas. 410; 8 id. 410; Field on Corp., § 494; 11 Ohio St. 228; 17 Ohio, 340.)

*Geo. R. Peck, A. A. Hurd,* and *Tomlinson & Griffin,* for defendant in error:

1. The persons who transact the defendant's business must necessarily know what its wants and necessities are better than anyone else. The necessity which will justify the ex-

ercise of the power of eminent domain, is not an absolute necessity. When the public interest is involved, whatever is convenient is necessary. Not only is the company exercising the power of eminent domain the best judge of its own necessities, but is the *only* judge. So long as it acts in good faith, its wants and requirements cannot be abridged. It is only when it abuses its powers that the courts will interfere. (Mills on Eminent Domain, § 62. See also 5 Allen, 221; 13 Barb. 646; 9 Rich. Law, 228; 22 Wend. 653; 22 Minn. 372; 33 Pa. St. 175; 64 id. 137; 43 Iowa, 501.)

Section 81, ch. 23, Comp. Laws of 1879, authorizes the condemnation of lands for route, side-tracks, depots, etc. The amount authorized to be taken for right of way is one hundred feet in width, but for side-tracks, depots, workshops, etc., " such land *as may be deemed necessary*." Deemed by whom ? Plainly the meaning is by the company, for no one else can know how much may be needed.

2. Can the power of eminent domain be exercised in behalf of other than " proposed " roads? It will be observed that § 81, ch. 23 of Gen. Stat. begins, without any limitation or qualification, with the words, "*Any* duly chartered and organized railway corporation ; " the grant of power is to "any " — that is, *every* — duly chartered company. Now such company may desire to obtain a right of way, or it may want to obtain grounds for depots, or for tracks, workshops, etc. If it wishes to get a right of way, it may apply to the commissioners of the county through which it " proposes " to build ; but if it wants grounds for the other purposes mentioned, it also applies to the commissioners. But the court will notice that the word " proposes " is not applied to those purposes, but occurs only in that part of the section which provides for condemning a right of way. The first thing a " proposed " road needs is a right of way ; it only needs side-tracks, depots and workshops when it has ceased to be a " proposed " road, and has become a " sure-enough " one. The proceedings in this case were not instituted under § 81, but under § 87, of said chapter.

3. Is the power to take land for side-tracks and depots exhausted by one exercise of it? Or is it a continuing power, which may be invoked whenever the public convenience requires it? The plaintiff argues that the company must exercise this power once for all; that it must know, at its peril, just what it will need during all its existence. Counsel have no mercy on us. They put us in this position: if we apply for the land when we *don't* need it, we are too soon; if we apply when we *do* need it, we are too late. Such a doctrine has no warrant, either in law or reason. (16 Ohio St. 390 is directly in point. See also 17 Ill. 127; 8 Nev. 100; 46 N. Y. 546; 63 id. 126; Mills on Em. Dom., § 59; 59 Pa. St. 23; 56 id. 325; 42 Miss. 555; 1 Md. 553; 33 N. J. L. 323.)

4. Can the defendant company acquire lands by compliance with the general law of the state respecting eminent domain, or is it confined to the special provisions of its charter?

The argument on this question may be made in a few words. The statute speaks for itself. It says:

SEC. 81. "*Any* duly chartered and organized railroad company."

SEC. 87. "*Any* railroad corporation . . . may apply."

SEC. 64. "*All existing* railway corporations within this state . . . shall respectively have and possess all the powers and privileges contained in this article," etc.

It is needless to suggest that the Atchison, Topeka & Santa Fé company is an " existing " corporation, and as such by the plain provisions of the statute may exercise the power of eminent domain.

The opinion of the court was delivered by

BREWER, J.: On the 24th day of March, 1881, the defendant company applied to the district judge for the appointment of three commissioners for the purpose of laying off and condemning certain lands and town lots in the city of Atchison, being the property of the plaintiff, which application being presented on said day, the district judge appointed certain commissioners in pursuance of the request

43 — 26 KAS.

so made in defendant company's application. Thereafter the commissioners so appointed published notice that on the 27th day of April, 1881, they would meet to discharge the duties of such appointment. On April 25th, the plaintiff presented and filed its petition in writing, duly verified, together with a bond and affidavits, and obtained an injunction against defendant company and said commissioners, restraining them from further action under such condemnation proceedings, which was duly served upon all of the defendants. On April 30th, defendant company filed its motion to dissolve said injunction. On May 14th, said motion came on for hearing before the judge at chambers, and affidavits and evidence were presented by the parties respectively, and the same were argued by counsel and taken under advisement by the court until May 18th, 1881, at which date the court dissolved said injunction, and the plaintiff now brings the case here for review.

Two principal questions arise; the first is this: Years ago the defendant exercised the right of eminent domain, condemned land for its line of road and for terminal facilities at the city of Atchison, built depots, side-tracks, etc., at Atchison, and completed its entire line of road. Now the contention of plaintiff is, that defendant's road being a completed road, and defendant having once exercised the right of eminent domain, its power in that respect is exhausted, and that without further legislative authority its right to take lands *in invitum* is lost. This question must be resolved by reference to the statutes; for, that the legislature can give to railroad corporations a right of eminent domain as continuous as their necessities, is not doubted. The sections of the statute providing for the exercise of this power are two in number — sections 81 and 87, pp. 230, 231, Compiled Laws of 1879. Section 81 reads:

"Any duly chartered and organized railway corporation may apply to the board of county commissioners of any county through which such corporation proposes to construct its road, to lay off, along the line of such proposed railroad, as located

by such company, a route for such proposed railroad, not exceeding one hundred feet in width, except for the purposes of cuttings and embankments it shall be necessary to take more for the proper construction and security of the road, through as much of said county as may be desired by such company ; and also such land as may be deemed necessary for side-tracks, depots, and workshops, and water stations, materials for construction, except timber, a right of way over adjacent lands sufficient to enable such company to construct and repair its road and stations, and a right to conduct water by aqueducts, and the right of making proper drains."

Section 87 as it stood originally in the laws of 1868 simply provided for the appointment of commissioners by the district judge, who were to make the assessment instead of the county commissioners; otherwise, and so far as any question involved in this case is concerned, the section was similar to § 81.   In 1870, the section was changed to read as follows:

"That any railway corporation, instead of applying to the board of county commissioners, as hereinbefore provided, or any person or persons through whose land or premises any railroad has been or is being constructed, may apply to the judge of the district court of the county through which any railroad is, or is to be built, for the appointment of three commissioners to make the appraisement and assessment of damages instead of the county commissioners; said commissioners shall be freeholders and residents of the county through which such railroad is, or is to be built. . . . . Such commissioners shall be sworn to honestly and faithfully discharge their duties as, such commissioners, and they shall do and perform all things in the manner and under the same regulations and restrictions as are provided in case such duties were performed by the county commissioners; and the subsequent and other proceedings, including appeal, shall be done and performed in the same manner; and the railroad company shall pay all costs accruing under any application under this section."

Now the argument of plaintiff is, that § 81 refers alone to a proposed, and not to a completed, railroad, and that in the first instance the corporation must condemn not only the land needed for its line of road, but also all that will be necessary in the future for its terminal facilities ; or, failing to do that,

it must acquire the latter by voluntary purchase alone.   It is urged that a grant like this being in derogation of private right, must be strictly construed; that nothing passes by intendment or implication, and that only so far as the power to condemn lands is expressly granted, can it be exercised by any corporation; that all doubts are to be resolved against the grant; and in support of these views are cited the cases of *Morehead v. Rld. Co.*, 17 Ohio, 340; *M. & E. Rld. Co. v. C. Rld. Co.*, 31 N. J. Law, 205.   It is further urged that § 87 was simply intended to give to the land-owner a right to initiate proceedings for the appraisement of his land taken by the company, and was not intended to give to the railroad company any increase of its right to condemn lands; or, secondly, that if it does give it a right to initiate proceedings after the completion of its line of road, it is a grant of power which, whenever once exercised, either before or after the completion of the road, is exhausted.

On the other hand, it is contended that any limitation imposed by the phrase, " proposed railroad," in § 81, applies only to the mere line of road; that that section gives authority to condemn such land for side-tracks, depots, etc., as may be necessary, which implies that it is to be condemned when it is in fact necessary or deemed necessary, and therefore as often as it is deemed necessary; and that the true grammatical construction of this section makes a distinction between land for the right of way, and land for depots, etc.   It is further contended, that while § 87 as it originally stood simply provided for other commissioners than the county board, the amendment in 1870 enlarged the power of the corporation in respect to this matter of eminent domain, and gave to it both before and after the completion of its road the right to condemn lands.   The language of the section reads, " is, or is to be built," and the right is given to the corporation, as well as to the land-owner, to apply for commissioners; and the closing clause of the section which gives to these commissioners all the powers granted in § 81, grants the power of condemning land for depots, etc., after the completion of the road, and

such land as may be then deemed necessary therefor. And in support of these views the following cases are cited: *T. & W. Rld. Co. v. Daniels,* 16 Ohio St. 390; *C. B. & Q. Rld. Co. v. Wilson,* 17 Ill. 127; *M. & T. Rld. Co. v. De Vaney,* 42 Miss. 555.

While the question may not be perfectly clear, we think the views expressed by the defendant are correct, and that its

1. Eminent domain, right of, not ended.

power of eminent domain was not, as respects land needed for terminal facilities, exhausted by a single exercise of the power either before or after the completion of the road. All legislation must be construed in the light of existing facts, and while a grant like this is doubtless to be strictly construed, yet such rule of construction does not forbid giving just and reasonable force to all the separate provisions of the statute, nor prevent its being interpreted by the actual experiences and necessities of life. Now it is perfectly plain, whatever may be the true interpretation of § 81, that § 87 gives to a railroad corporation power to condemn lands after the completion of its road. Doubtless this embraces cases in which the corporation has in the first instance occupied lands without legal right and seeks to perfect title thereto; but we think it also includes cases where the road, having been completed, the corporation as here needs enlarged terminal facilities. Section 87 refers to and partially adopts and incorporates § 81, and putting the two sections together and writing out in one sentence a statement of the grant so far as this question is concerned, it would read about thus: "Any railway corporation may apply to the judge of the district court of the county through which its road is, or is to be built, for the appointment of three commissioners to lay off a route for such road, and also such land as may be deemed necessary for side-tracks, depots," etc. Reading the grant in that way, it would seem that the power is given to condemn land for terminal facilities whenever deemed necessary, and that one exercise of the power did not exhaust it. Railroads, as all know, are things of growth; they enlarge with the development of the country. Starting

as small enterprises doing a trifling business, as the country develops they extend — their business expands — that which in the inception afforded ample facilities becomes inadequate for the increasing business, and the company stands between two difficulties.  It must either imperfectly discharge its duties to the public, and thereby expose itself to liability for damages, or must enlarge its facilities, which, if it cannot be done by the power of eminent domain, will expose it to any exorbitant demands for land which business rivals or avaricious individuals may see fit to exact.  This defendant's history fully illustrates this fact.  It is but a few years since it commenced building its road.  At first it was but a feeble corporation with but a few miles of track, and one whose business needed little rolling stock and very slight terminal facilities. Now it has become a gigantic corporation, owning hundreds of miles of road and part of a transcontinental line.  Either in the infancy of the corporation the promoters must have had the foresight to anticipate its future development, and upon the first application condemn for its use all the land at the various stations which such future development would ever require, or else it must stand now at the mercy of any rival or individual owning land at the place where its business necessities compel it to have more room.  All this, which is but a part of the common experience and history of the country, must have been before the legislature at the time of these enactments, and such legislation must be interpreted in the light thereof.

Now, is it not reasonable to suppose that it would legislate in harmony with rather than counter to this law of railroad growth?  Is it not more reasonable to believe that it intended to give the power to take such land as might be needed, when it should be needed, and thus enable the company fairly and fully to discharge its duties to the public, rather than that it intended that in its inception the corporation should condemn an unreasonable, apparently unnecessary amount of land, or else be thereafter at the mercy of any who should happen to own land where its increasing business compelled it to have

more room? It was well said by the supreme court of Illinois, in the case cited from 17 Ill.: "We cannot suppose that it was the intention of the legislature to oblige the company to acquire all the land in the first instance which in any event it should ever want, to do the largest amount of business it may ever hope to attain. The greatest degree of sagacity could hardly determine precisely what conveniences the future might demonstrate to be necessary to do its business with facility." It must be borne in mind that our railroad corporations are now organized under a general law; that a general law makes all the provision for exercising the right of eminent domain; that no special charters and no special corporate powers are granted. The legislature in its enactments is not determining as to the necessities or probabilities of any particular road, but is laying down a general law for the regulation and control of all railroad companies. Such a general law should be in harmony with the experience of the country as to the necessities and growth of railroad corporations. Again, it may be fairly doubted whether in the first instance the road could condemn for depots, side-tracks, etc.; any more land than its then prospect of business would adjudge necessary. It is given power to condemn as much land as may be "deemed necessary."

Could it under this grant condemn any more land than was deemed necessary? And could any land be deemed necessary which was not in fact required for the company's present business, and which would not be needed in the future except through some unexpected and rapid growth of the company's business? The supreme court of Ohio, in the case from 16 Ohio, *supra*, say: "The power to make 'necessary side-tracks,' *prima facie* is the power to make them *when they are* necessary. Otherwise it would be the power to make *unnecessary* side-tracks. *Prima facie* power to do any act, is power to do it in such manner and at such time as is *usual, convenient* and *reasonable,* in such way as prudent men manage their own concerns." See in addition to authorities heretofore cited, the following, which support the conclusions reached by

us : *Hamilton v. Annapolis Rld. Co.*, 1 Md. 553 ; *S. Car. Rld. Co., Ex parte*, 2 Rich. 434 ; *S. Car. Rld. Co. v. Blake*, 9 Rich. 229 ; *Rld. Co. v. Lovejoy*, 8 Nev. 100 ; *Rld. Co. v. Speer*, 56 Pa. St. 325.

One other matter may be mentioned in this connection as strengthening the right of this particular defendant. It is one of the few corporations in the state created by specia charter; this was granted by the territorial legislature of 1859. (Special Laws 1859, p. 57.) Such special charter, § 3, provides that the company, " for the purposes of depots, sidetracks, . . . may take more land, earth or material, as may be necessary for the construction or completion, operation, preserving, maintaining said road ;" so that if this extra room is needed for the operation of the road, the company may under this section take it.

We do not rest our conclusions upon this section, however, but upon the provisions of the general law heretofore cited, and refer to this simply as strengthening the conclusions otherwise reached.

The other principal question is this: The special charter above referred to made certain provisions for exercising the right of eminent domain. These proceedings differ slightly from the proceedings established by the general law; and the contention is, that the company can proceed alone in accordance with the provisions of its charter, and cannot proceed 2. Condemnation under the general railroad law. This is a misof lands; right take. The general railroad law applies to all corof railroad company. porations. Section 81 commences, "Any duly chartered and organized railway corporation ;" and § 87, "Any railway corporation." It does not refer simply to organizations organized under that statute, but includes all. No language could be used more general, more comprehensive. There is nothing in the nature of the thing to prevent a legislature from granting this power to corporations organized before the admission of the state, and by special charter from the territorial legislature. If the company had no right of eminent domain given by its special charter, the state legis-

lature could, by general law, endow it with such right; and if it had the right, the legislature could, by a similar law, enlarge its modes of proceeding. The question simply is, whether a special chartered corporation can avail itself of the general procedure established by law for all railway corporations; and that question must be answered in the affirmative.

These are the only questions which we deem of importance in this case, and in them appearing no error in the rulings of the district court, its order will be affirmed.

All the Justices concurring.